We'll hear argument first this morning in Case 14-1280, Heffernan v. City of Paterson, New Jersey. Mr. Frost. Mr. Chief Justice, and may it please the Court, public employees have a right not to be demoted on patronage grounds. It does not matter if you are affiliated with a specific party or that you are non-affiliated. It does not matter if you are mistakenly perceived by your employer or supervisor that you're engaged in political association to be protected by the First Amendment. Kennedy. How would you define the right at issue in this case? The issue here is public employees. How would you define the right that your client wishes this Court to vindicate? I'm defining the right in that, pursuant to Elrod and its progeny, that there is not necessary to have any affirmative acts that, by virtue of being a public employee, he has the right not to engage in political association. Well, that's just a restatement of Elrod. Would it be fair to the proposition that you're putting before the Court to say that you're asserting the right to be free from government inquiry into an oversight of your views? Would that be a fair statement? It would be a fair statement, Justice Kennedy. Because, look, do we to – it sounds to me from the way you began your argument that we take this case on the assumption that if he had picked up the sign, that if he had been supporting the candidate for chief of police who was challenging the incumbent, if he had been engaged in the activity, that would be protected. He could not have been demoted. You want us to take the case on that proposition? Do we have to accept that proposition for you to prevail in this case? No, you do not have to accept that proposition. The proposition is just clearly that as a public employee, he has a right to either associate or non-associate, and he doesn't have to commit an affirmative act in support, in this case, of the mayor's opponent, which was Chief Spagnola. Roberts. Roberts. Well, but the First Amendment talks about abridging freedom of speech, and I thought the case came to us on the proposition that he wasn't engaging in speech at all, that he was not engaging in association, he was not engaging in trying to convey a message, he was just picking up a sign for his mother. And if that's the basis on which the case comes to us, I'm not sure how he can say his freedom of speech has been abridged. In this case, Mr. Chief Justice, the case comes to us with respect to association. With respect to speech, speech is governed by a different doctrine than association. There's no need to do a Pickering analysis in this case. He wasn't associating with anybody any more than he was speaking. He was doing neither one. He was associating with his mother, I suppose, in picking up the sign for her. But he was not expressing any political view, he was not associating with a political party. Scalia, what case of ours vindicates the right that Justice Kennedy described to you and which you readily agreed with? What case of ours vindicates that? Elrod would stand for that proposition. Elrod says you have a First Amendment right to favor a political party or not favor a political party, and you cannot be fired for doing so. That's not what happened here. But he was not favoring a political party. Exactly. He was not expressing any First Amendment view whatever. I mean, he was fired for the wrong reason, but there's no constitutional right not to be fired for the wrong reason. If he was fired because his government employer thought he had committed a felony and he hadn't, he might have a cause of action under some statute. But there's no constitutional right not to be fired for the wrong reason, and that's what happened here. There's a constitutional right, Justice Scalia, to be able to be free from patronage decisions and to be discharged or demoted on patronage grounds. And in Elrod's case, we say that we never said that. Elrod and Branty are cases decided under the First Amendment. The First Amendment guarantees the right to freedom of speech and freedom of association. Your client was neither speaking nor associating, so how could he possibly have a cause of action under the First Amendment? He doesn't need to speak, and he doesn't need to take a position. The Routon plaintiffs, they didn't take a position with respect to promotion or transfers. They took the fact that the matter is, is that since they were not affiliated with the Republican Party or supporting the Republican Party or endorsed by the Republican Party, none of those individuals would have been promoted or transferred. They didn't take any affirmative acts. Alito, I don't understand your answer. What expressive activity did he engage in? He wasn't he was not allegedly demoted for failing to support the mayor. He was allegedly demoted for seemingly supporting the mayor's opponent. In Waters, this Court looked at the motive of the employer, the motive of government. If government perceives that you are engaging in a political activity and the motive is to suppress one's beliefs and associations or non-associations, then you look at it through government's analysis, and it's their basis of their facts that you are evaluating. Here they evaluated the facts that he was engaged in campaigning. Officer Heffernan went to a political gathering. He went and picked up a sign. What was misperceived by his employer was the fact of his intent. He said that I'm not intending to support Spagnola, but he is doing all those incidents that are core First Amendment activities. Roberts, to clarify what I, how I thought the case was presented, let's say the employer comes in to Smith and says, you know, Smith, I saw you getting a political sign, and you're fired. And Smith says, it wasn't me, I was off, you know, in a different town then. In other words, it's a pure mistake of fact. Your answer is, it seems to me, you try to get advantage of the fact that there you could perhaps have argued this was expressive activity, say, oh, he was at a meeting, a political event, he was getting a sign. But your theory, I thought, didn't depend on that at all. It was simply a mistake of fact. And then, now, can the person who wasn't even there, can he bring a First Amendment challenge to his dismissal? Feigin. And the point that I was making, and again, but it's still not clear to me, what is the right that he's asserting? And I'll back up while you're thinking about that. Kennedy. Can a local government say that all our employees must be neutral in campaigns and must not take part in campaigns? They can vote, but they can't take part in campaigns? Like the Hatch Act? Well, there are Hatch Acts. There was no provision here. Can the government insist on neutrality? I think the government can have a policy, after balancing the interest between that of the employer and that of the position. Is that an issue? Is that an issue in this case? Is there any allegation that there was such a policy of neutrality, that no employee could engage in political activity? Justice Ginsburg, there was no such policy in this case involving. I'm sorry. I thought there was an unwritten policy. There was a policy that Chief Wittig said that existed with respect to members of his staff only. However, with respect to that policy, there's no testimony regarding that policy. In other words, the people that worked in the Chief's office, there were four individuals who were officers. None of them ever heard of that policy. Also, that policy was never raised below in any of the motions for summary judgment or the motion before the Third Circuit twice. So we believe that that motion is way. But to answer your question, Your Honor, is the fact that no one knew of this policy. So he could say he had a policy and he'd make reference to it, but it's just not supported by any evidence in this case. Roberts, is there a remedy for your client apart from this action under the First Amendment? Does he have civil service protections of any kind or, I don't know, collective bargaining? Let's just say, what would happen if the boss comes in and says, you know, for the you didn't turn off the lights last night, you're fired? Can he – is there a way for him to say, you know, I was on leave yesterday, it wasn't me? Well, that's not a constitutional violation for him. No, no. My point is that maybe this shouldn't be a constitutional violation if there are adequate remedies to address what may or may not be a First Amendment issue. Mr. Chief Justice, there are – there were no other remedies. There is a State of New Jersey has a State Civil Rights Act, which mimics 1983. Just because there is such a right doesn't mean that you can diminish the First Amendment rights. So clearly we preceded with the fact that there was a violation of the First Amendment just because it was created by the State. There is no civil service protection. Scalia. What is the New Jersey Act? That's a strange act. It protects State employment only against First Amendment violations. No, it mimics — I can't imagine that. It must have other protections for State employees. With respect to the New Jersey statute, it's just identical to a 1983 clause of action. So it doesn't give you any additional rights. Officer Hefferon has said that. You have to violate the Federal Constitution to get relief under New Jersey law? Do you have to? Yes. That's what 1983 says. What does New Jersey law say? He proceeded in Federal court. He has every right to proceed in Federal court for a First Amendment violation. What does the New Jersey law say? You brought it up. I didn't bring it up. What does it say? New Jersey law, the statute, just mimics a 1983 clause of action. So it says if you violate, you can't fire a State employee in violation of the Federal Constitution. That's what the New Jersey law says. It's a strange law. You don't have the text of it, do you? I'm sorry? The text of the New Jersey law, so we can know what we're talking about. Sure. I mean, this was the New Jersey law can't create substantive rights. So with respect to this matter, he's also not protected by civil service either. Mr. Goldstein's brief says New Jersey law provides a statutory right of action for an attempt to violate an individual's civil rights. Is he wrong? An attempt to violate? Yes. So it is included in there, but that doesn't give you an exclusive right. You can't diminish his First Amendment rights. No, the question is not whether the New Jersey law somehow abrogates First Amendment rights. The question is whether he has an independent remedy under State law. That's the question I think is being asked. He could have a remedy under State law. But in this instance, he pursued his First Amendment rights. How could he? If we say there's no First Amendment right, what civil right has he violated? Was violated? If what Mr. Goldstein says is the State of the law attempting to violate civil rights, what right, if we say there isn't the First Amendment? The right not to associate. Well, if we say it doesn't exist, you lose this case. If what doesn't exist, Justice Sotomayor? Just that, the right you're claiming. He has every right to bring this claim in Federal court as an objection. He may have broader substantive rights under New Jersey law. I would be somewhat surprised if that were not the case. The civil rights to which this, the New Jersey statute refers, may refer to rights under the New Jersey Constitution or other New Jersey laws. They are New Jersey laws. But just because, again, it doesn't abrogate your First Amendment rights. So the fact it shouldn't matter whether or not he engaged, there could have been a violation of any type of New Jersey statute. It wasn't alleged in this case. It was never brought up by Respondents in this case during any of the arguments on any of the briefs. And therefore, with respect to this matter, it's our position that he has every right to maintain this litigation with respect to violation of his First Amendment right. And here he is alleging that he has the right not to associate. And that right really stems from the fact that we have, that this Court has considered in Elrod and his progeny. Furthermore, the Third Circuit makes its mistake in requiring Heffernan to actually engage in some type of political activity, campaigning. That's not necessary, as I've indicated with respect to Elrod and the Rutan plaintiffs. Additionally, the Third Circuit's decision in this case is actually lacks common sense. I mean, if you take a hypothetical with two police officers going to pick up a sign, and when they go to pick up the sign, they are at a campaign gathering and one police officer states to his employer, yes, I was supporting Spagnuolo, and Mr. Heffernan would say, no, I'm not supporting it, I'm doing this to pick up a sign for my mother, it should make no difference. The outcome is still the same in the sense that they are both engaged in that activity. The only difference is that the employer perceived Mr. Heffernan as engaging in protected activity. They went to stifle and squash his rights of association or non-association. Their motive was to suppress that. And clearly, that has a chilling effect on other employees. I mean, it's just very clear from the testimony in this case, and if you go to the appendix, page 50, what is very telling about this case is the fact that when he went to pick up the sign, there was a councilman there who was the chairperson of the election, and he says to Heffernan, he says, boy, you had better be careful, maybe you should come back later while we're hanging up these signs. And that clearly shows the chilling effect that it would have not only in this police department or in the city of Patterson, but other employees in different jurisdictions and different areas would have the same issues. You would have to think twice before you did something. If you went to a political gathering or a campaign and you went to hear a speaker speak and you picked up a pamphlet and put it on your desk, the — if your employer saw that and they didn't like that candidate and they took action against you, you would see that that is action based on a motive to suppress one's rights. Scalia. All of those things would be true if the mayor gave a speech saying, I am going to fire anybody who's not a Republican. All of those things would be true. Would it chill people? Would there be a cause of action? Would anybody have a cause of action because of that speech? Because of the speech itself? Yes, just a speech. He hasn't fired anybody. He's just said, I am going to fire anybody who's not a Republican, or anybody who's not a Republican will not get promoted. Justice Scalia. Does anybody have a cause of action for that? There would be no claim because no action was taken. So part — you have the perception that you're engaged in activity. Exactly. So what counts is whether action was taken for a particular reason, not whether you chilled — whether you chilled people. What you're arguing to us is this is unconstitutional because it chills other people. That doesn't — that just doesn't carry water. Justice Scalia, what carries water is the fact that in this instance, Heffernan was denoted on the employer's mistaken perception that he was engaged in activity, and you don't need to engage in that activity. Would you say that he was demoted because he gave the appearance of exercising his First Amendment rights? Yes, because they perceived it, that he was exercising his rights. And the fact that he actually was not engaged in any political activity should make no difference with respect to the motivation and outcome of what took place with Mr. Heffernan. The issue was clearly that it was ill will, it was because it was against the administration, and they took that action to suppress that belief and it chills other. Mr. Chief Justice, may I reserve the remaining time if there are no other questions? Thank you. Mr. Chief Justice, and may it please the Court. I'd like to start with Justice Kennedy's question about how we define the right here. We think that Petitioner has a First Amendment right not to have adverse action taken against him by his employer for the unconstitutional purpose of suppressing disfavored political beliefs. He was directly injured by that. Kennedy, and what's your best case for that proposition? Well, we think that there are two aspects of this Court's case law, I think, that support that, and then I'd like to get back to your concern about probing of beliefs. But we think that the way that the Court defined the right at issue in Branty, in Rutan, and again in O'Hare demonstrates that an employee doesn't have to affirmatively exercise his First Amendment rights first. So in those Court's case, in those cases, the Court said that the plaintiff can show a constitutional violation of the First Amendment simply by showing that the employer acted for the unconstitutional purpose of suppressing disfavored political affiliation. And those cases, Ms. Andrews, I missed what you said those cases were. So that was Branty. This is at 445 U.S. at 517, again in Rutan, and then in O'Hare, which is the government contract. Scalia You say in all of those cases no First Amendment right was being exercised, right? Is that your point? Andrews Well, I think actually in the Rutan case, there were three plaintiffs, and it wasn't clear, actually, whether they had engaged in any affirmative exercise of their First Amendment rights. Scalia Was it clear that they had? Andrews So what the Court said was that they hadn't. Scalia Was it clear that they hadn't? Andrews It was not clear whether they had or hadn't, and the Court didn't inquire into that. So what had happened there was that the plaintiffs had been, had adverse action taken against them because they had lacked the support of the correct Republican Party officials. That's all the Court says about their allegations. There are any number of reasons they could have lacked that support. They could have affirmatively refused, obviously, to seek the support, which would be an exercise of First Amendment rights. But on the other hand, they may simply have not had the time to seek the right of support or they may have been ignorant of the requirement in the first place. Those wouldn't have involved an affirmative exercise. Scalia I thought in all of these cases up to now, whenever anybody is fired, demoted or even not promoted, it hurts and you want to bring a lawsuit sometimes. Up to now, those lawsuits would have to show, I was asserting a First Amendment right and it's for that reason that I was not promoted. But what you're saying is you don't have to show that at all. All you have to assert is that the reason I was not promoted was that the employer believed that I was thus and so or not thus and so. You don't have to show any assertion of a First Amendment right. You just show that the employer liked Republicans and that's enough. Anderson Well, I think in the employment context, I think there's no question that the plaintiff was directly injured by the unconstitutional condition. But to respond directly to your point, I think — I don't think there's a serious concern here that there will be a meritless — a flood of meritless lawsuits or anything like that. And that's primarily for two reasons. I take your point that this will expand the universe of litigation somewhat, but we already know in the statutory context that courts have recognized suits based on a mistaken perception, and in that context we haven't seen any flood of meritless lawsuits. And with respect to Elrod claims specifically, I think it's always been fairly easy for plaintiffs to allege that particular affiliation of belief. I was in the Republican Party. Roberts How do you know we haven't seen a flood of meritless lawsuits in that context? Anderson Well, we haven't in the statutory context. Roberts Yes, the one you were just referring to. Anderson Well, when we looked at this, it doesn't come up very much. And when it does, it looks to us that courts have been able to use the standard technique to do that. Roberts You're looking at the reported decisions rather than — you haven't done any survey to see how many complaints have been filed in this type of case. Anderson No, but when you look to reported decisions, what you see is that courts are able to use Twombly and Iqbal and summary judgment in order to get rid of claims where the allegations aren't plausible or there's no evidence. But I also think if the plaintiffs are going to have to allege that they actually held the beliefs in question, this is going to raise exactly the concern that Justice Kennedy mentioned earlier about oversight of beliefs, probing into beliefs. So this will affect all Elrod cases. So every time an Elrod case is brought, the defendant will have the incentive to say, I have a belief in Elrod. Kennedy So are you saying there's a right to be secure from government oversight of your beliefs?  Well, I think the Court recognized in O'Hare that that is a particular concern in the affiliation context. We don't want courts to have to examine the nature and extent of the plaintiff's beliefs or associations. Scalia I mean, that's a good idea maybe, and maybe it should be in, you know, some civil service act. But where do you find it in the First Amendment? Well, I think the right in question is the right not to be subject to a test of political affiliation. Kennedy Is that because you're concerned with the chill or is there some other right that is somehow affected that's a First Amendment right of the individual? You turn around, you say the government cannot act for an unconstitutional purpose, but we usually ask how is the defendant hurt? What is his right? And that's still a little bit unclear to me. Well, we think the defendant has been hurt in the constitutional sense, because the way that the Court has defined the right in question is the right not to be subject to a test of political affiliation when it's not a reasonable job requirement. And I do think that what the Court said in O'Hare essentially was that we're not necessarily talking about a separate right not to be subject to probing of beliefs, but I think the Court was suggesting that we shouldn't have First Amendment tests if we can help it that lead the Court to have to probe into a plaintiff's beliefs. And that is exactly what will happen. Roberts I don't know why the right isn't the right to be free from arbitrary employment action based on a mistake. That's his objection here. You made a mistake. You thought I was, you know, being politically active. I wasn't. I mean, isn't there such a right under New Jersey law? You can't be fired for an arbitrary reason or you can't be fired for a mistaken reason? I think at least with respect to some job actions, there would be such a right under New Jersey law. I'm not sure whether it would apply here, but I think the gravamen of Plaintiff's complaint here is not that he was fired for an inaccurate reason. It's that he was demoted because, for an improper purpose, the perception that he was engaging in protected First Amendment activity. And it's not that he was fired for an inaccurate reason. Ginsburg You brought up in your brief, I think, that the employer might have had a high-track type policy. I think you said we should remand to determine whether this employer said nobody engages in political activity. Well, I think if you rule for the Petitioner here, there would be a remand anyway, because the courts haven't adjudicated. Is there basis in the facts up to now to think that there was such a policy? Well, so there is, I think, a factual dispute about this. So if you look at the summary judgment filings, this is document number 189 on Pacer, there are in the Respondent's statement of undisputed facts some assertions that this was, in fact, a neutrality policy. Now, you definitely have a dispute about that coming back from the other side. Petitioner says that nobody knew about that policy. So we think that is one thing that potentially the lower courts would have to look at, decide whether it's preserved, and resolve the dispute in that sense. But I do want to get back to another concern that I think Respondent's position raises. You know, we do think that Respondent — that Petitioner has his own First Amendment right here that was violated. We do think that when an employer acts against an employee based on a misstatement perception of his beliefs, that creates exactly the same chilling effect with which the Elrod cases are concerned. So the other employees will know that the employer expects political orthodoxy and will be chilled in their own association as a result. And I think there is another concern here that deepens the chilling effect, and that is that the logic of Respondent's position applies not only in cases of honest mistake, it also applies in cases in which the employer acts to exploit a loophole. Essentially, you can imagine a situation in which the employer knows that some people have engaged in political affiliation. The employer wants to send a message, and it does that by acting against the employee it thinks didn't actually engage in that association. And so I think that is one of the dangers of Respondent's rule here, that it will create a loophole. And so what we are saying essentially is that this is just a narrow corollary to the Elrod right that the Court has already recognized. When the employer acts with the exact same intent that is already impermissible under Elrod, and it injures the employee in his employment as a result, then the employer should be equally liable. It shouldn't get a free pass simply because it's both ill-motivated and wrong. If there are no further questions. Roberts. Thank you, counsel. Mr. Goldstein. Mr. Chief Justice, and may it please the Court. The doctrinal fight in the briefing is over whether the plaintiff in a case like this has to assert a constitutional right. And I think the questions so far have indicated an understanding that the plaintiff would have to. And the real question then is, is there actually a constitutional right here, one that we might define in other terms, including the one that Justice Kennedy identified as the right not to have your political views inquired in. And this is actually discussed in the Court's opinion in O'Hare in describing Elrod and Branty. And so I want to start there, because we have to recognize that this right has never been recognized in any other political association case whatsoever. And there's no logical reason why it would occur specifically in the public employment context, which is an unconstitutional right. Ginsburg. Can you explain, Mr. Goldstein, what sense it would make to say there are two people, the example Mr. Frost gave, one of them is a big supporter of Spagnuolo, and he gets demoted, and the other is politically neutral. And he gets demoted because the employer thinks he's a supporter of the rival mayoral candidate. How could you make sense to a person of ordinary reason that one of them, the one who was in fact engaging in political activity, can't be demoted, but the other one who just was innocent didn't do anything? Andy. Goldstein, I'm sorry. Goldstein, I have to focus on really the precise wording of your hypothetical, but I think you may actually have something slightly different in mind, because you identified as the second employee one who is politically neutral. And the Court has said in cases like Elrod and Branty that the decision to remain neutral, that is, I see this candidate, I see that candidate, I'm going to just not choose between them, because I'd, you know, for any individual reason, that that's protected, that's a political choice. And in your precise hypothetical, both of those employees would have a claim. This case is different and critically different. The other side has quite consciously throughout the case made only two arguments. The first is that he was a supporter of Spagnuol, and he's given up on that. And the second is that he had no association whatsoever. He didn't have any more association than I did. He was politically oblivious. And so, Justice Ginsburg, if you were to ask me that question, which is what difference what sense does it make, the sense that it makes is one is exercising a constitutional right and one doesn't.   Kagan. So just to make sure I understand what you're saying, suppose there's somebody who comes into office and it's a Democrat, and he says, I want as many Democrats as possible in my office, no matter what jobs they are doing. Now, what you're saying is, he can't demote or fire Republicans. He can't remove, demote or fire people who have other political views, neither Democrat or Republican. But what he can do is he can get rid of anybody who's just politically apathetic. Is that your view? If that was actually the policy, then technically the answer to your question is yes under the First Amendment, and I'd like to explain why. I know it sounds anomalous. The reason is that those people, there is nothing in the First Amendment that says that the government can't encourage people to be politically active, and that is entirely the point of Elrod and Branstad. Kennedy, so you encourage the person to be politically active and then fire him or her because they're politically active the wrong way? No, sir. Suppose the employee says, you know, I don't like the evening news, I like science fiction, I don't know if I'm a Republican or a Democrat, I don't care. He cannot be fired? What is his right? My point, Justice Kennedy, is that he may have a State law right, he does have a collective bargaining agreement right, but he doesn't have a First Amendment right because he's not engaging in First Amendment-protected activity. I do hold that the government has a right to compel him to declare one way or the other? Justice Kennedy, that brings us back to your question, and that is, does he have a right not to have an inquiry into his political views? And that is, of course, not a right that's been recognized in any other political association context. When the Court discussed it in O'Hara, it did it in a very specific and really important way, and that is, it looked at cases like Elrod and Branty, which are general policies. And what the Court has said there is that when it's a sweeping policy, it's not necessary to inquire into individual political beliefs. And what those cases ought to be understood as is applications of First Amendment overbreadth doctrine. It is commonplace in First Amendment law that if you have a general rule and the general rule will be unconstitutional as applied to some people and the other people involved the policy can be facially unconstitutional, and we don't inquire into the individual standing of the plaintiff. And that's what happens in Elrod and Branty. It's not necessary to inquire into the each individual employee. It is an entirely different kind of political process. Kagan. Kagan. Kagan. I always thought that the idea behind those cases is a different one, that the idea has to do with why the government acted. And once we say that the government acted for an impermissible purpose, which is to, let's say in my hypothetical, get as many Democrats as possible into the government, once we say that's an impermissible purpose, it matters not at all whether the person is a Republican, an independent, or somebody who's never thought about politics in his life, because the government is acting in a way that's wrongful irrespective of that. And we just disagree. It's called an individual right, not a government wrong. The individual has to be engaging in, whether it's expression or association. I actually think it's not contested, Justice Kagan, any more on the free speech side, that with cases like Waters, an employee cannot bring a First Amendment free speech claim that says, you know, I didn't actually engage in speech, but my employer thought I did. There is no First Amendment right not to have this individual inquiry. And, Justice Kennedy, remember that our position in particular doesn't mean that the government can compel speech of a person if the person really just doesn't care one way or the other? No, it's a very important distinction. So let me give a hypothetical that ought to be hard for us, and that is Heffernan is asked by the chief of police, you know, do you support the mayor? He's completely agnostic, and he refuses to support the mayor, and he's transferred. The decision not to support or to be subjected to your hypothetical is a political choice. This case was framed by the plaintiff in a very specific way on purpose, and that is he disclaimed any such influence, any such pressure, any such choice that he was having to make. Now, the important piece about this question of inquiry is that our position only applies to a party that doesn't claim anything other than being politically apathetic. So, Justice Kennedy, there is no inquiry. Justice Kagan is quite right that if you have somebody who is an independent or a Democrat or a Republican, the First Amendment doesn't care. But if the plaintiff is going to pursue a claim that says I'm not engaged in association or speech, there's nothing to inquire into. Ginsburg. Let's take a Title VII case, and the employer fires a woman because he thinks she's pregnant. She brings a sex discrimination case and alleges, when I wasn't pregnant, I just was gaining weight. So does she have no sex discrimination claim then because she wasn't pregnant? Justice Ginsburg, their courts are divided. The position of the EEOC is that she would have a claim. I just think it's a good point for us that Congress can write laws that recognize such regarded-as claims. Scalia. Those statutes focus on the employer. The employer cannot discriminate on the basis of sex. And that employer was doing that. The First Amendment does not focus on the government. It focuses on the citizen. The citizen has a right to free speech and free association. So that's the difference between the two cases. It will not surprise you that I agree, Justice Scalia. Justice Kagan, if we could just take this outside the public employment context, and the reason I want to do that is that we ought to be able to agree that the First Amendment rights aren't greater associational rights there. The Court has pointed out that there's a greater Federalism interest in managing the public employment workforce, and also that this is an unconstitutional conditions case. But just imagine the following simple, you know, hypotheticals that relate just to this case. Imagine that the chief of police, with the same motivation, went up to Heffernan as he went to pick up the sign, grabbed the sign, and tore it up. Or imagine that Heffernan was trying to stop from entering a parade in favor of Spagnola, but what he was actually trying to do was just cross the street. Or he went to the building where it is that Spagnola had his headquarters, and the chief of police stopped him from going in, but he was actually going to his lawyer's office. Those are all the exact same motivation, and I don't think there's any way the Court would recognize such a claim. It's a very sympathetic claim, okay? I get the fact that we are very concerned that public employees not be transferred or demoted, but we have other laws and other regimes that fill that gap. Roberts. What is the other law here? What relief does he have? He has two forms of relief. The first is the collective bargaining agreement. I will tell you that it is not in the record, but it is judicially noticeable. It is a public document. It's available on the government websites of the State of New Jersey, and it is exactly what you would expect. In fact, it's a little bit broader. It says that if you are — you have an employment action that is inequitable, it is — it is grievable. The second thing is the attempt provision, which was discussed, and Justice Alito is right, that there are broader civil rights under New Jersey law, and this just makes sense. The Court, in cases like this— Roberts. Well, do you agree that the Petitioner is entitled to relief under that provision of the collective bargaining agreement? If his allegations of the facts are correct, yes. And you are hypothetical about stopping the person from crossing the street or, they think, entering the parade. The individual is — has no right to insist that the government doesn't make a First Amendment judgment about his activities? That's correct. Justice Kennedy— In other words, the individual and the citizen of the United States have no right, have no injury, have no interest in making sure the government doesn't evaluate everything they do from a political standpoint? I think they have an interest, Justice Kennedy. I'm not saying that. We are concerned that people be able to have conscience, that they be able to make their own personal private judgments. But what we are talking about here in a context in which there is a real concern that I would like to talk about, about whether it will interfere with the management of local government, that it's an affirmative constitutional right. It's a violation of the First Amendment. Now, the reason you ought to be concerned, Justice Kennedy, is there is another side of the coin. Take it from the perspective of the supervisor. If this right is recognized, which is to say the plaintiff need not have engaged in any association, then the supervisor's expression of political views may well be to worry that any employee can say, look, I was regarded as politically active. If I could just give you this case again, and that is, take the sign out of it. The plaintiff says he was well known as a Spagnola friend and supporter, okay? Imagine that that's discussed in the chief of police's office. But the chief of police thinks that Heffernan really should be transferred. Okay? The chief, if the Petitioner is right here, really has to worry, because if it's discussed, then there's every reason that Heffernan can just bring a lawsuit saying, look, I wasn't actually involved in the campaign, but you did it because he was my friend. And that is a very significant consequence for the individual rights. Now, if we didn't have other protections that get to the concern about conscience, I could see the case being even stronger. Kennedy, we know that you can't be, let's assume in this particular position you can't be fired because you're a Republican or a Democrat. And that's what they do. But that the person did not engage in that activity. He still is in the position of the government ascribing to him a political belief that he does not have. Justice Kennedy, that's right. The government thinks a lot of things about me, okay? Some of them are not very nice, I imagine. But and some are about my politics and that sort of thing. But there is not a constitutional right to have the government not think something about you. Just remember as well. Here they thought and they acted. Okay. A word to act, Justice Kennedy. It's not just something. It's the government is taking action against a person because the government thinks that that person is exercising First Amendment rights. And I thought, unlike Justice Scalia, that the rest of the First Amendment is operating on government. It says government thou shalt not. Thou shalt not act on the basis of someone's expression, speech, or belief. Well, essentially all of the rights, individual rights in the Constitution other than the anti-slavery provision require State action. They all talk about what the government can't do. But what the government can't do. Yes, so here the government acted, no question. They demoted the person. This was a detective and they put him back on the beat. So the government acted. Why did they act? Because they thought that this person was engaging in political activity. Well, Justice Ginsburg, let me just say that I don't think it's contested after the Petitioner's reply brief. You described this in First Amendment terms, that if this was a speech case, which it used to be, rather than an association case, he would lose. It is well settled in this Court's precedence that the threshold inquiry under Pickering is did the individual engage in the constitutionally protected activity. This actually is an issue, I should say, in the Court's other associational case, public employment association case, this sitting, where there is a significant issue of is there a different rule that applies when we're talking about a policy, Justice Kennedy, that applies broadly to a lot of employees, versus an individual one-off employment action, which is what is at issue here. We think that's a critically important distinction, whether you look at this as kind of a Pickering standard case, where the first thing that has to happen is that the individual has to be engaged in the constitutionally protected activity. If you have an Elrod and Branty type case, which is what's discussed in that part of O'Hare, it's an entirely different kettle of fish, because there you do have a general policy. You could see people being chilled. You could see the government taking a broad view of its employees. Kagan.            Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Justice Kagan, that's of course not what I'm saying. What I'm saying is that under First Amendment overbreadth doctrine, when you have a general policy, and this is what we think happened in Elrod and Branty, the fact that you do not inquire into the individual person's political views because the policy is facially unconstitutional, but it has never been the case in any context and the other side has had every opportunity in the world, we cannot find any First Amendment rule that says, you know what, you don't have to engage in constitutionally protected activity so long as the government thinks you did. And it's really a problem if that's the rule, because it is the threshold thing that stops plaintiffs with meritless cases from getting out of the box. In all of these cases, if the plaintiff no longer has to say, I engaged in the rule of law. Kagan.   Kagan. Kagan.       Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. And I just don't think you can do it. But the second is, that's right. The Constitution doesn't fix everything. Kennedy. You want this Court to hold that the government of the United States has a right to ascribe to a citizen views that he or she does not hold? Justice Kennedy, I think that that is not a First Amendment violation. I don't think the other side thinks it's a First Amendment violation. Remember, there's the materiality requirement? Kagan. Kagan. See, I had always thought that the First Amendment, running through all our cases, is an extremely strong strand, that part of the reason we have these protections is because we worry that government is doing things for impermissible reasons, that the government wants to create a world of speech in which everybody agrees with it, and nobody opposes it, and that that's a fundamental tenet of what the First Amendment and all our cases are about. And you're saying, oh, no, the government's motive doesn't really matter as long as you can't point to somebody who is holding up a sign. Justice Kagan, I think you are right. It is an important thread of this Court's decisions, and the Court has said that it is a necessary but not sufficient condition. Waters makes very clear, which is a First Amendment public employee case, that the individual has to have engaged in the constitutionally protected activity. Every one of the — Garcetti says the same thing. You have to have an individual. Breyer, can I just approach the same thing from a different perspective? Suppose, can Congress pass a law or a legislature pass a law that attempts to abridge the freedom of speech? Is that a violation of the First Amendment? It's an attempt. What would the attempt be? I'm not going to ask you a question back. Well, they say they have a thousand examples. I mean, you say they pass a law. But no one can espouse in a public place the political philosophy of Ruritanianism. Okay? I mean, I doubt that they will pass such a law, but I just substitute anyone you want for that. They pass it. And by the way, the six people who hold that philosophy all leave on a boat before the effective date. But or, what's more likely, they bring a declaratory judgment action and the law never takes effect. And therefore, it had no impact. And that happens every day of the week. I'm just wondering if such a law, which is an attempt, is right on the books, as blatant as you want, whether that violates the First Amendment. That's a serious question. I'm not taking a point of view. I want to know what you think. Justice Breyer, the reason that we allow the law to take effect. Well, I just want to know, is it yes or no? Does it, in your opinion, does an attempt, a clear attempt to violate the First Amendment in a statute that has a general application, does it violate the First Amendment? Does it abridge the freedom of speech? If it's only going to be an attempt and it's not going to succeed, no. The statute you describe is unconstitutional. It is unconstitutional. That's right. There are all kinds of times under the law. It will have a lot of bad effects. It will have all kinds of chilling effects all over the place. If it's defined, Justice Breyer, as not going to succeed, if the statute doesn't say that. No, no. By chance it happens not to succeed. Well, no, Justice Breyer, if the person has to succeed. It's my hypothetical. I know. I'm just trying to keep up with it. In the one that you just described, Justice Breyer, if it is the case that the law is going to go into effect, we do allow, including under First Amendment overbread grounds, an effort to bring a declaratory judgment action. Of course. And I'm just asking you if, in fact, they think it will succeed, they want it to succeed, that's why they passed it, and through a fluke it fails. Does the fact that it fails mean that it doesn't violate, it doesn't, does it not violate, does it or does it not violate the First Amendment? It doesn't, and here would be an example. It does not. And here would be an example. Any failed example, if it fails, all right, go ahead. If I could just finish, Justice Breyer, just so I really do want to help. If Congress at the same time passed a law that said no Federal funds shall be used to implement the ban on talking about the political views of Ruritania, that is to say the law won't go into effect. We tried, but the money was taken away from us. It's not unconstitutional. Scalia. Or you could say that the law is passed by Congress but vetoed by the President. Is there a violation of the Constitution? There would not be. But in my hypothetical or in Justice Breyer's where it actually goes into effect, I am just saying. there's no injury in this situation when the law doesn't go into effect. But coming back to what Justice Breyer I believe is attempting to say. I don't know, Mr. Goldstein, that I understand either. And I think Justice Kagan asked you this. Why does it matter, and we don't care, whether someone is a Republican or not in Elroyd and Brunt and those cases, and you say it's only because it's a policy? The intent of the government is to say I'm not going to promote anybody who is not a Democrat or not a Republican. Goldstein, More than a policy, it will actually have adverse consequences for individuals exercising their constitutional right. We're talking about people who are young and not promoted people. All right? So you have to have someone come in and say I'm not a Democrat? I'm not a Republican? Do you need someone to tell you what they are? No. Common sense does not leave the courthouse. And that is, if I have a policy that says I will not hire Democrats, I think a court would understand that there are going to be Democrats who would apply for jobs. And there doesn't need to be an inquiry. So then, why isn't it simple to say I'm not hiring you, or I'm demoting you, because you politically associate? And doesn't that chill the person from even walking by a campaign? Doesn't it chill others who do want to associate marginally? I'm assuming that there's no policy in place, or there's nothing to prevent this otherwise, like the Hatch Act. I think it's a really important point on the question of chilling, because Elrod and Branty and the rules that also, and O'Hare, which is a one-off case, do say that you can't do this for political purposes if the person is actually exercising a constitutional right. So that we all agree that if the plaintiff here was a supporter of Spagnuolo or even of the mayor or had decided to remain politically neutral, this is a bizarre case that comes to you on the assumption that he is completely politically apathetic. Scalia It is bizarre. And do you really believe, Mr. Goldstein, that the Constitution does not solve all problems? You made a statement to that effect. You really believe that? It doesn't solve every problem. Goldstein No, but I do think that there is a concern that comes into play. And so I do not mean to demean the concern about the government having a sense of what individuals' political views are. But I'm saying that that happens, Your Honors, in all kinds of cases, whether it's redistricting, whether it's campaign finance. There's lots that we do to ascribe political views to people in this country, and adopting that doctrine is going to have pretty widespread consequences when it's not necessary. I do think that it should be common ground that there are multiple layers of protections for these employees. The basic rule — and, Justice Kennedy, remember, under the basic rule, the plaintiff has always come in and said, I'm a Democrat. Right? The Elrod Branty rule, when it's involved one-off cases, the opinion in O'Hare describes the political views of the Totrec company there. And it has never been regarded as a First Amendment problem when you don't actually exercise any First Amendment rights. Breyer, it is a First Amendment problem for the reason that lots of other people will have their speech chilled. And normally in the law, there is a doctrine where the person who does the bad thing that makes a mistake, he's held anyway. That's true of transferred intent. You shoot A, but you meant to shoot B. It's true of attempts generally. It's not true of the Constitution. Why not? That is to say, I would think that a statute that has a chilling effect on the speech of millions of people, but is directly aimed at A, B, and C, if because of some fluke A, B, and C are not themselves injured, nonetheless everybody else is, and it would still violate the First Amendment. That, I think, is what you have here, which is why I raised my point. Great. Justice Breyer, and if you would just contrast in your own mind the statute that affects millions of people versus the beat cop who talks to one person in terms of its chilling effect, because First Amendment overbreath doctrine was born because of your hypothetical, the concern that a broad policy or statute will have widespread effects. That is not anything like this. We have a doctrine. Scalia Do you know of any case in which we have relied on chilling effect where what was at issue was a one-off like this one, as opposed to a general policy which had a chilling effect? I don't know of any case. To the contrary. I can tell you that in both Waters and Garcetti v. Ceballos, the Court said, look, we recognize the rule that's being proposed to us. So in Waters it was the idea that the public, the employer's views wouldn't matter. It would just be whether the speech was protected. In Garcetti, it was the question of whether it was the public employer's speech. And the public employee's argument in both those cases is that, look, these rules are going to chill speech because they are of uncertain boundaries. We need to have wide-ranging expression. If I have to bring my case, there will be inquiries into my speech views or whatever. And the Court said, look, we just have to balance things here. There is a real concern that is rooted in a history of the United States involving political patronage. We have not — the Court has never tried to extinguish politics from local government. And if you try to do that in New Jersey, we are going to be here a lot. The question in this case seems to me to be highly artificial. It's a sort of — it's like a law school hypothetical. How often will it be the case that an employee will be unable to allege any expression or any association that is protected by the First Amendment? It seems to me quite rare, and it may be that this case comes to us the way it does, because the plaintiff was dealing with two things. One was the First Amendment, and the other — I mean, one was the issue that's the question of his motivation, and the other was this alleged policy prohibiting any kind of political activity, even in the person who is just apathetic. Is there not a First Amendment right to be — say, I don't like politics, I don't want anything to do with politics, I'm not going to register, I'm not going to vote? All right. So, Justice Alito, the Third Circuit has a rule discussed in the brief in opposition adopted in a case called Galley that says you do have the right to be politically apathetic. The reason the case is so bizarre is that the other side, for its own reasons, decided not to assert that right. Now, I will say that it does nonetheless matter, because there are going to be other kinds of cases where you have a public employee that just is not asserting any rights at all and is not involved, say, in environmentalism or gun rights or whatever. And the public employer, if it's thought just to have perceived the employee as having been involved in some association, then is subject to a claim. And our real question is whether that is true. Sotomayor, you have to show some facts to draw that inference. And you just can't say, I'm involved in this and the employer fired me because of that. You have to show some connection between the firing and the political belief. I would just take you back to my hypothetical of getting rid of the sign and his political view, his support of Spagnola is discussed in the Chief's office, right, and then he has to be reassigned, and the Chief has to really worry that he's going to be sued. My point is this. The set of cases that you have to be concerned with, there have been no other cases we've been able to identify like this one. It's very small. But the downside risk is significant. Kagan. Kagan. If somebody had come into me before today's argument and just said, does the First Amendment prevent the government from punishing a person because that person does not share the government's views, I would have said, yes, of course the First Amendment protects that. That's the whole point of the First Amendment. And now you're telling me, no, the First Amendment does not prevent the government from punishing a person because that person doesn't share the government's views, unless that person is actively opposed to the government's views. But if that person just really could not care less, which a lot of people in this country could not care less, they don't vote, they don't pay attention, they wouldn't know who was running, but the government can punish that person because that person doesn't share the government's views. And I would have said, that is one strange doctrine. It may be that I have not persuaded you in this case. The — I will say, Justice Kagan, what you ask is can the government do it? The government cannot, because there are lots of other protections. And remember, if the person is politically neutral, it is the case that the right of political association is the right of political association. If you aren't engaging in it, you aren't actively pursuing the right in any way, or even if you aren't active about it. Roberts. Thank you, counsel. Mr. Frost, you have a minute left. Thank you, Mr. Chief Justice. A couple of points that I want to make with respect to declaring one as a neutral. If Heffernan was engaged in political activity and said, yes, I'm supporting Spagnol, of course he would be protected by the First Amendment. What I'm hearing is that if he said, I'm neutral, he would be covered, he would be protected. I see little difference between being neutral and being agnostic in the sense that I'm not taking a position. So the question is, what is the difference between being neutral and being agnostic? Sotomayor. I'm so totally confused. I know the way it was presented to us, but I thought he testified that he had made a choice not to get involved in the campaign, but that Spagnola was his friend and he supported him. So he wasn't neutral. He just wasn't engaging in associational conduct by choice. That's what I thought. That's correct, Justice Sotomayor. And the point that I was trying to make was the fact that in this case he was not going to be exercising his right to vote or campaign for him, but clearly he engaged in what we would consider core First Amendment activity by picking up that sign. The mistake that the employer made was actually one that they perceived him as actually campaigning on behalf of Spagnola. And that should make no difference for the simple reason that with respect to that activity, it's because the Court sees that the government is acting for an impermissible purpose. And that wasn't suppressed. Thank you, Counsel. The case is submitted.